All persons having business with the Honorable in the United States or individuals of the Ninth Circuit from now until the end of the year, give your attention and you will be heard. God save these United States and this Honorable Court. Please be seated. Before we hear the first case for oral argument, my colleague Judge Smith has some words. Thank you, Judge O'Skell. I appreciate it very much. It's my privilege to be on the panel this morning and to make a few very brief remarks about my distinguished colleague who is our presiding judge today. Some of you may be aware that Judge O'Skell advised the President of the United States recently that effective December 31, he will take senior status after a service of 30 years as an active judge on our court. What that means is that since this is our last hearing, this is his last day as the presiding judge. He has done that many, many times with distinction. Before we go forward, I just want to put in context a little bit about Judge O'Skell's career on our court. Of course, I'm sure there will be many articles and so on. As he himself, I'm sure would appreciate, this is not a funeral. He's going to continue to serve. He's going to continue to serve on the court and not as an active judge. But during, according to the research that we've done in the 30 years that Judge O'Skell has been on the court, he has participated before today in 4,832 cases. He has authored 610 majority opinions and 97 dissents, perhaps even more significantly in terms of the law of the United States. This is only since 2000 when our court began to keep track of this. He has authored 37 dissents to failure to take a case en banc, which is part of our en banc process, 27 of which have later had certiorari petitions filed with the United States Supreme Court, and 16 of which resulted in grants of certiorari. In terms of law, it's very important to note that 13 of those resulted in a reversal of Ninth Circuit law. In other words, a 93% success rate on those that were actually appealed. So, as I say, I'm sure there will be a great deal of ink spilled over the next many years evaluating the great career of our colleague. But I wanted to just take a moment this morning on this last day of our colleague serving as presiding judge to acknowledge, thank, and really salute him for his great service to the court as an active judge, indicate that we all, and I'm sure I can say this for a judge, Bill, we look forward to continuing to serve with Judge O'Scanlan, but I wanted to just give this brief aconium and thank you for your service. Well, thank you very, very much, Judge Smith. This is a totally unexpected ceremony. I'm very happy that you emphasized this is not a funeral. I have told the chief judge that I will continue as a senior judge to sit roughly halftime, so I intend to continue to sit. I've been very, very privileged to have magnificent colleagues, yourself, Judge Gould, and all of the members of the court. It's just been an enormous pleasure for me and a great satisfaction and a huge honor to be able to serve for 30 years, and I look forward to many years more. Not 30, but a few years more. Well, now that we've got all of that out of the way, again, thank you very, very much. We will call the docket. And the first case for oral argument today, I should mention one other thing. We have a lot of cases today, and we have decided that we're going to have a recess after the third case, in other words, after the Tenier v. Wells Fargo case. We will break for 10 minutes or so, so that any of you that are here for the Yves v. Gila River case or for the Dowers case, you can expect that we will not reach that case until close to, let's say, 11 o'clock. So with that guidance, I will call the first case for oral argument, which is Smith v. United Airlines. Counsel for the appellant, you may proceed. Good morning, Your Honors. May it please the Court. My name is Dow Patton. I represent the plaintiffs and appellants, Mr. Smith, Moody, and Tran. Your Honors, this case presents two primary questions. One of, and I'm sorry, I'd like to reserve five minutes. You may do so, Counsel. Thank you. Thank you, Your Honor. Two primary questions. One, did the plaintiffs below the appellants timely bring their claims to court? And second, did they state a claim for a hybrid claim of breach of duty of fair representation and breach of contract against their employer and their union? In the first, we did get counsel's for appellee's letter regarding the Rollins case. The Rollins case didn't have a timeliness file issue, but it is very instructive for the court. The Rollins case held that whether or not it's arbitrary or bad faith or misconduct, these are questions of fact. The Rollins case was resolved at summary judgment in favor of the union, and it was reversed because the factual question of whether the underlying conduct itself was arbitrary or not is something that has to be borne out by discovery. And in this case, we've got something very similar. The reason for not granting workers at SFO, the guys that put the bags on the airplane, did the United's treatment of them and the union, the treatment of them as less than their counterparts in other airports throughout the system, was that in itself arbitrary? While it's a merits-based issue, counsel, I wonder if you could spend a minute with me on the statute of limitations matter. Absolutely. The record, it appears that your clients need to show that their claims didn't accrue or they weren't aware of it before October 16, 2013. Do you agree with that? Your Honor, the standard is what they knew or should have known. Right. That the union would not process their grievance further. Right. As I look at it, nothing can have happened before that time or before there's a statute problem. And as I see it, there are two things. First of all, Moody and Tran were told that the union wouldn't be filing complaints on their behalf before that date. And then their counsel's letter, I don't know whether it was you or not, but this is August 2013, indicated that the workers knew their grievances were not being pursued because the letter asked when the union was going to commence the grievances. Either one of those, it seems to me, unless I'm missing something, says that your clients knew or should have known before October 16 that the union was not going to proceed. What am I missing? Your Honor, there's a couple of issues there. One with respect to Moody and Tran. They were informed that they couldn't open a grievance because one was open. That's the key. It was an open process. And throughout this, it's our position. So they weren't told that the union would not be filing a complaint on their behalf? Yes, because there was one open, Your Honor. Because they claimed, the union claimed to the plaintiffs, that we don't have multiple grievances on the same issue. If it's open, it's going to apply to everybody. In your view, when did the statute start to run? Your Honor, it's our position that the grievance is still open, but it became clear when the new contract was negotiated in November. Of 2013. That is when, and these are the facts that we could have alleged in our third issue in our opening brief, Your Honors, was there are additional facts. Those additional facts would be that the plaintiffs were told, this will be taken care of in the new contract. Well, but how do you deal with your letter? Was it you? I don't mean to put you into it. It wasn't you. It was you. Your letter of August of 2013 said that the U.S. Union commenced, in quotes, the grievance process. How do you reconcile that language with what you're now saying that suggested the union just kind of said, well, we're working on it? So the date of that letter and the negotiation of the new pre-merger, of the new post-merger agreement between Continental and United Airlines was the reason why we wrote the letter, because we believed that the issue needed to be resolved before the new collective bargaining agreement was addressed. But your letter didn't say anything about that, did it? It said the merger, and that's why the time was of the essence. So that's what triggered the letter was the merger? Yes. So we were approached by a number of different plaintiffs, and we do not identify in that letter who the plaintiffs are that in our second amendment complaint it is alleged to have some class action. On behalf of all of the ramp agents, we're denied this pay at San Francisco Airport. The reason why we wrote the letter is because there are a number of different people that approached us. Some of those ended up being our clients, and we filed a lawsuit on them. I understand that when you ask the union to, in quotes, commence the grievance process, you aren't referring to the clients you're representing today. You were representing some other people unidentified in the letter that were part of a class action. That's correct, Your Honor. Did you make that clear in the letter? We did not. We did not identify anyone in the letter, Your Honor, because there were a number of different people that some chose to hire us, some chose not to go forward with the lawsuit. However, as a class, they would have the opportunity to opt out. Now, with respect to the – I do have to point out that the counsel's letter does contain a misquote, the letter of December 9th. It contains in quotes, commence a new grievance. There is no new reference to new in that letter. It's to commence a grievance process. Whether it was stalled, whether it was a new one, commence a grievance process is what we were requesting. The response was nothing, zero, no communication whatsoever. So if a plaintiff has their counsel say, hey, I've got this merger, the merger and the new collective bargaining agreement coming up, we want this issue resolved before then, it would seem to me that the appropriate trigger, and the district court's opinion does not say when the cause of action accrued and when the trigger was. The trigger would be the new collective bargaining agreement. Or would it be you're their attorney, you're a smart guy, you knew nothing was happening, you said get this going, let's commence it. So whether it was for these plaintiffs or the class action plaintiffs overall, as of August 2013, you knew they hadn't done anything. And you asked them to commence it, right? That's correct. We asked them to commence the grievance process. And, you know, when you send out a letter, you can put any time frame you want in there. It's your choice. But the real question is, is it the proper policy to keep these claims out of court based upon this type of an accrual or analysis? Did they sleep on their rights sufficiently? Well, that's really what statutes of limitations are all about. A lot of people don't like them. But the legislature has determined in its wisdom that these things become stale. If you want to preserve your rights, you've got to act within a certain period of time. And the problem that we're struggling with here is, did your clients know or should have known, either counsel and otherwise, that they had certain rights and they needed to do something within a certain period of time? So that has to be counterbalanced, Your Honor, with the rights of the employer and the union to extend indefinitely. They have the power to extend indefinitely a grievance, to hold it in advance. And what communication from the union would you cite to that indicates that they agreed to any such thing? Hold on. We're going to take this will be taken care of in the new collective bargaining agreement. Is that what they said? They did not. Those were the allegations that we proffered. That's not what you said, but I'm just saying what documentation from the union, what statement by a union official do you refer to, that gives any credence to the idea that they agreed to indefinitely extend this grievance? The plaintiffs are without the benefit of discovery. I understand, Your Honor. But you've made an allegation, I guess with enough information and belief, that this is what they said, but you don't cite to anything. And that's what I'm asking for is what do you rely on, whether it's on information and belief or not. What did they say, what did they do, that gave you the idea that they had agreed to an indefinite extension on the grievance process? So the statement by the union to Mr. Smith was, this will be taken care of in the new collective bargaining agreement. Hold on, first. And then second. And when was that made? That was made before August of 2013. That's much earlier than your letter comes in August. Correct. And so that statement of hold on, we'll do it, when you take it in context with the rights of the union and the employer, under the collective bargaining agreement, to indefinitely extend leads to a rational conclusion by somebody looking at it from a plaintiff's standpoint. Well, they're holding on to it. It's open. And they're going to do something about it when the new collective bargaining agreement is. Counsel, you have less than four minutes left. Do you want to say anything about the duty of fair representation? Yes, briefly, Your Honor. The duty of fair representation is key here because the conduct was arbitrary, and it was not a mere exercise of judgment. This is not where the union came in and said, hey, you know what? We completely understand what you're arguing about, and we've done an analysis, and here's our position. Let the plaintiff know, let the union member know what it was. What's your best case of it? We cited, we start with G. I'm sorry, Your Honor. They're in the window? Yes. Oh, no. Briggs? Brotts? And? Yes, and Galindo as well, Your Honor. It's, there was the decision whether or not, there's two issues. One is the underlying, the underlying conduct, which is why are people at SFO not entitled to the same amount of pay as everybody else around the country? I'm focusing on the judgment issue. That's crucial, is it not, whether it's judgment or whether it's arbitrary? Correct. And the question of whether, of how to process the grievance and say, yes, is this, is this, does this have merit or not? That, there's no evidence that that ever occurred. There's absolute, there's no evidence and there's no allegation that it actually occurred. It's our position that the grievance was left open and remains open because they haven't been communicated with to say, we've considered it, we've rejected it. You're down to two minutes, counsel. You may want to reserve those. Yes, Your Honor. We'll hear from the other side. Good morning. May it please the Court. My name is Michelle Gerke. I'm counsel for Defendant Pelli, United Airlines. With me today is Ira Gottlieb, counsel for the Union IAM. We'll be splitting our time, so I will try to leave Mr. Gottlieb seven and a half minutes. All right. We'll give you 15 minutes between you. Correct. Thank you. There are three issues before the Court this morning. The first has to deal with the statute of limitations issue that we spent a lot of time talking to Mr. Patton about just now, and I'll be primarily addressing those issues. Mr. Gottlieb will primarily be addressing the issue of the union's duty for representation and then the issue of whether or not leaves to amend should have been granted. Although we're happy to address any of the issues that the defendant wants to discuss. As the Court has rightly noted, the issue is whether or not plaintiff's claims, the issue is whether they accrued prior to six months of filing their complaint. And under Galindo, the standard is whether they knew or should have known of the alleged breach of the duty of the fair representation. And I believe counsel misspoke when he said that the district court did actually not identify a date. The judge did say in her order that she believed the claims accrued no later than August 2013, and she primarily relied on counsel's letter to the union asking them to commence a grievance process. And you rightfully zeroed in on this issue of the language in the letter which asked them to commence a grievance process. And, in fact, on the second amended complaint, plaintiffs took out the word new grievance in the second amended complaint. And if you look at the first amended complaint, it actually did say new grievance. So we believe that that was artfully omitted to try to make it look like they were not actually asking the union to start a new grievance. And, in fact, if you look at the allegations in the first amended complaint in paragraph 36, plaintiffs allege that they requested that the union start a new grievance with the intent to get a resolution to dismiss grievance, which would allow other RAMP agents the opportunity to grieve issues related to the RAMP agent pay. Counsel, what difference do we owe to the district court's determination that August was the date, if you will, the commencement date? Well, as the court's aware, it is a de novo review at this point, but I do think that the district court does deserve some deference in their view of the plausibility of the claims as alleged in the second amended complaint. And when you view the four corners of the second amended complaint itself, it's very clear that the claims are barred by the statute of limitations. And if you go even further and look at the allegations in the original complaint, as well as the allegations in the first amended complaint, it's even more clear that the claims are time barred. Because when they filed the second amended complaint, they omitted many of the damaging allegations in earlier versions of the complaint, where they explicitly alleged that they were told that the union had sided with United and that there was not going to be a grievance hearing commenced on this. And it's because the union rightfully understood that there was local variation at SFO and that the RAMP agents were not going to be paid the card person lead pay. And that this was something that was part of the collective bargaining agreement because of the side letter, which contemplated this local variation. And the grievance exercised their judgment. I mean, sorry, the union exercised their judgment on the grievance and realized that it had no merit and they didn't want to process the meritless grievance, which is well within their judgment to do. Did the district court pay attention to the, if you will, carving up of the initial complaint, its reconfiguration in an amended complaint in determining the statute of limitations issue in this case? No, Your Honor. She did not. She was concerned with the Ninth Circuit holdings in PAE and felt that she really had to rely solely on the four corners of the second amended complaint. We did bring to her attention some of the contradictory allegations that were omitted from one version of the complaint to the other because we felt that it went to the plausibility standard and plaintiff's ability to plead a claim that could withstand a motion to dismiss. But she was very careful to say, I need to look just at what's in the second amended complaint and relying solely on those allegations, primarily counsel's August 23, 2013 letter, but also the statements that were made in the allegations that the union members were told, this is the way it's done in San Francisco. We don't need these in San Francisco. All those allegations, I believe, formed part of her judgment that the claims are time-barred. I also want to briefly touch on this issue that there was some kind of mutual agreement to extend the time consideration for the grievances because that is the second theory that the plaintiffs put forth in the second amended complaint. And this kind of goes to your question of should we only be looking at the second amended complaint or should we be looking at the first amended complaint as well? And in the first amended complaint and the original complaint as well, I believe, the plaintiffs alleged that the grievance had not even been presented to United. And the district court relied on that when it granted defendants first motion to dismiss the first amended complaint because the grievance procedure within the collective bargaining agreement specifically states that the time limits in the grievance procedure can only be extended by mutual agreement. And then plaintiffs alleged that the union had not even presented the grievance to United. So how could United have mutually agreed to extend the time limits? I forgot right off the bat. Were the complaints in this case verified? No, they were not, Your Honor. Nonetheless, obviously, we feel that, you know, counsel must have some basis to plead these very specific allegations and very specific and repeated statements. He named very specific union officials that made these statements allegedly and even provided some date timeframe. So it was not just very general and they were not made on information and belief, which, you know, is his tactic that he took in the second amended complaint. From your perspective, then, the variation in statements really goes to plausibility or anything else. Is that right? I would agree, Your Honor. I think it does go to the plausibility standard. And I think it also goes to the leave to amend and the issue of futility. You know, the court in the oral argument on the motions to dismiss the second amended complaint gave counsel an opportunity to explain, you know, where he was coming up with these allegations, what factual basis did he have, and how would he propose to amend the complaint further if given that opportunity. And he was not able to articulate what exactly he would do. And I would note that this allegation that they were asked to wait until after the new 2013 collective bargaining agreement was ratified, that actually was in the first amended complaint and they took it out. So his proposed amendment for, you know, a hypothetical third amended complaint is something that was just going to add back in what he already had in the first amended complaint. So I would like to reserve some time for Mr. Gottlieb. So unless the panel has any more questions, I'll defer to him. No further questions, Mr. Gottlieb. Thank you very much. We have the remainder of the time. Good morning, Your Honor. My name is Ira Gottlieb. I represent the Machinists Union Local Lodge 1781 in L.A. And I think I will pick up kind of where Mr. Patton was, where Mr. Kierkegaard was, but I think we can start with the idea that the district court correctly determined that this second amended complaint simply does not state a valid claim for a breach of the duty of federal representation. I think the pleadings really essentially reflect, if you take them as a whole, no more than the plaintiff's objections to the union's refusal to process their grievances. Those objections do not, no more, state a valid duty of federal representation. Are we, as a panel, really compelled to determine whether what the record shows the union did was an exercise of judgment? That's right. Based on the pleadings. And if it was an exercise of judgment, then you win, right? If it was an exercise of judgment, then it cannot be arbitrary under the case law What we're saying is that the union has the right to exercise judgment to decide even if it's wrong, or even if it makes an error in judgment. If it is an error in judgment, then it cannot be an arbitrary violation of the duty of federal representation. So why don't you respond to Mr. Patton's argument that essentially the union did nothing? Well, Your Honor, that's contradicted by their own pleadings. First of all, there are allegations that the union filed grievance, or that the employees filed grievance with the union, and that the union said to them, you don't need leads in San Francisco. You know, this is the way it's done in San Francisco. Those are paragraphs 110 and 111 of the Second Amendment complaint. And in the First Amendment complaint, they're more explicit. They remove those more telling allegations from the Second Amendment. When they said in the First Amendment complaint that the union, that United Airlines was operating properly in response to their allegations. So that's on the merits. I'm saying we think, well, it didn't get into a law analysis. It really doesn't have to. This is the kind of allegation where people know what they're getting paid. There wasn't any question, I don't think. There wasn't any dispute about what they were getting paid and what work they were doing. So, but there's a contractual side letter, 74-8M, which I believe is supplemental in terms of record, page 126, which basically says we recognize, the union and the company recognize different stations. Obviously, United is a national airline. We'll operate and deploy their ramp servicemen differently because there are different large and small stations, different populations of employees at each station, different ways of operating, larger or smaller, and more stream and flow of business from one station to the other. So that at least gives you a basis for saying that the union had an exercise of judgment because they were, in the first time they complained, there were allegations that the union representatives told employees, this is the way it's done, and United is acting properly. And when they had conversations, the union reps sided with United. That's an actual quote from the first time they complained. So from your perspective, there's an agreement between UAL and the union that permits the very, if you will, variation among airports and the way ramp workers are treated when clients talk to the union representative and they said, look, UAL didn't mess up here. This is okay. So this is basically clear. In effect, we bring it back to an agreement of memory and of understanding. And from your perspective, that justifies the action, this judgment, and an arbitration. Well, it puts it, whether or not the union was correct or not, that is part of the basis of a judgment. And it puts it into the realm of a judgment. Right or wrong, we're not allowed to say. I mean, the prototypical arbitrary kind of conduct by the union would be in the Dutchess Act case and cases like that where the union just blew a time deadline. And because of that deadline, which was in a discharge case in the Dutchess Act, the employee lost all her, I believe it was a female, all of her rights. The arbitrator actually found this grievance was untimely. The discharge stands because the union was untimely. That was actually an exception and a limited one by this court where the rights are very important and where it's completely extinguished by something that really characterizes gross negligence that can qualify as arbitrary. But here, once you get into the realm of the union looking at something, whereas even if it isn't an encyclopedic analysis of what's going on, I think this court also talks about the amount of analysis, the amount of investigation, the amount of contemplation depends on the complexity and the importance of the case itself. Here, it was pretty apparent what was going on, and there wasn't a whole lot of investigation or deliberation that was needed, and that was communicated repeatedly according to the first amendment and the second amendment. Okay. Anything further? I'm sorry? Anything further? The only thing I would just add is that under the eclectic desk case that we reported on, I think it's pretty clear that here the allegations do not exclude the possibility of unlawful conduct by the union, and therefore, for that reason and the reason we've been talking about in brief, we would ask that the court affirm the judgment below you. Thank you. All right. Well, thank you, counsel. Mr. Patton, you have some reserve time. Thank you, Your Honor. Galindo says the context matters when we're looking at the running of the statutory period. Context matters. Here we have this policy of we're only going to allow one open grievance at a time on a particular issue. That's part of the context. The other part of the context is we have pending contract negotiations after a large merger between very large unions. The upshot of the district court's ruling is you have to go file a loss in the middle of contract negotiations. That would be contrary to the union's interests. It would be contrary to everybody's interests. The last point I'd like to make is with respect to the analysis that Your Honor was talking about with my esteemed colleague, there was no analysis here. There was no analysis and there was no communication with the employee other than some broad assertions about that's not the way we do it or things like that. There was no analysis of the underlying differences between SFO and O'Hare. There was no analysis of why these people are being treated differently when they come to San Francisco. Thank you, Your Honors. Thank you, Counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Gould, M. Smith